FILED '07 MAR 07 13:54 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JACKSON & PERKINS WHOLESALE, INC., | ) ) | Civ. No. 03-3091-PA |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| SMITH ROSE NURSERY, INC., et al., | ) ) | **ORDER** |
| Defendants. | ) ) ) | |

**PANNER, District Judge**:

Plaintiff Jackson & Perkins Wholesale, Inc. brings this action for breach of contract against defendants Smith Rose Nursery, Inc., Calvin J. Smith, and Melvin W. Smith. The parties stipulated that the court would determine whether the parties reached a settlement agreement in February 2003. *[handwritten: Before trial, I decided this issue in favor of plaintiff.]*

These are my findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a). I conclude that the parties did not have a settlement agreement and dismiss defendants' counterclaim for breach of the alleged settlement agreement.

1 - ORDER

## FINDINGS OF FACT

I base the following findings of fact on the record, including the trial exhibits and other documents submitted by the parties. I did not consider the affidavits submitted by plaintiff specifically for this hearing.

By a contract effective August 1, 2002, plaintiff agreed to sell roses to defendant Smith Rose. Because the contract included an extension of credit from plaintiff to Smith Rose, defendants Calvin Smith and Melvin Smith, Smith Rose's sole shareholders, personally guaranteed Smith Rose's indebtedness to plaintiff.

In September 2002, plaintiff made two shipments of roses to Smith Rose's facility in Florida. Defendants contended that about 55,000 of the 153,000 plants were not viable.[1] For several months the parties discussed whether plaintiff was responsible for the non-viable plants.

On February 3, 2003, at 7:02 a.m., Calvin Smith emailed Charles Anderson, senior vice-president for plaintiff, an offer to settle parties' disputes. Smith proposed that plaintiff credit Smith Rose for about 16,000 roses from the September 2002 deliveries; that plaintiff credit Smith Rose for several other shipments; and that plaintiff "[p]ush back the due date on all invoices until we sale [sic] the current crop and have collected. Have the credit dept back off on collection calls."

On February 3, 2003, at 9:57 a.m., Anderson emailed a

---

[1] The jury returned a verdict that 88% of the plants plaintiff shipped were viable.

2 - ORDER

counter-offer to Calvin Smith.  Anderson proposed shipping 40,000 excess roses at no charge to Smith Rose, from 2003 to January 2006; reducing the May 2003 invoice by $120,000; and "spreading out the payments" on that amount in installments due September 2003, May 2004, January 2005, and May 2005.  Anderson stated that "acceptance of this offer will satisfy all credit requests from Smith Rose Company re 2003 shipments/invoices."

On February 7, 2003, at 4:34 a.m., Calvin Smith emailed Anderson, writing, "I think your reply is a good step to get this resolved.  It takes some time to understand what's included in your offer and I think it needs to be run by the credit dept to make sure they understand it.  I was a little surprised that you[r] verbal offer was $12,000 more than the later written offer."  Because Calvin Smith had worked for years as a regional sales representative for plaintiff, he was aware of plaintiff's procedures for approving agreements.

On February 7, 2003, at 7:48 a.m., Anderson responded by email to Calvin Smith, "I have already run my offer past credit and they are OK with it or I wouldn't have sent it to you - that offer is still out there.  What is your decision?"

On February 21, 2003, at 1:56 p.m., Anderson emailed defendants.  Defendants contend that Anderson's February 21, 2003 email memorializes an oral agreement reached earlier by telephone between Melvin Smith and Anderson.  In the February 21 email, Anderson stated that he was "[s]ummarizing my call with Melvin." Anderson then gave terms to "clear all current credit issues,"

3 - ORDER

including (1) plaintiff would sell Smith Rose 7,500 Grade #1 Huey roses at $3.04; (2) Smith Rose could select another 7,500 Grade #1 Huey roses in June 2003 at no charge; (3) Smith Rose would be credited with 45,000 Fortuniana units, and the May 2003 invoice would be reduced by $135,000; and (4) Smith Rose would pay plaintiff $32,800 on September 15, 2003; $45,000 on May 15, 2004; $45,000 on January 15, 2005; and $35,000 on May 15, 2005.

On February 24, 2003, Anderson emailed Calvin Smith, stating, "I did my part and postponed $135,000 from May but you have to pay what you owe now or I can't release any further shipments."

On February 25, 2003, at 12:18 p.m., Calvin Smith emailed Anderson, stating, "Melvin and Charlie reached an agreement last Friday [February 21, 2003] to settle our claims pertaining to the 55,000 dead Fortuniana roses.  Charlie is to furnish 45,000 roses from overproduction during the next four seasons.  Charlie pushed out the due date on $135,000 to match the date the roses are to be furnished.  That helps, but did not help our current cash flow situation."

On February 25, 2003, at 6:44 p.m., Anderson emailed Calvin Smith, stating, "You need to get caught up on your past due amount before we can release the next shipment.  Please square away with Credit.  The agreement I made with Melvin only affects the May invoice, not the invoices already outstanding."

By letter dated March 14, 2003, Brad Earl, who managed credit for plaintiff, wrote to Calvin Smith, stating that plaintiff had "conceptually agreed to amortize a sizeable portion of [Smith

4 - ORDER

Rose's] debt over the next 15 months." Earl wrote that to "finalize this agreement," he enclosed a promissory note and security agreement for the Smiths to sign.

On April 17, 2003, Anderson emailed Calvin Smith, asking, "How are you doing on signing and returning the note, security agreement and personal guaranty documents we sent you? Without that here's where you stand today - I can't hold of[f] Finance and Legal much longer." Anderson wrote that Smith had said on April 4, 2003, that he had received the documents but forgotten about them. Anderson stated, "You were going to sign them and FedEx back the next day."

On May 14, 2003, Calvin Smith emailed Anderson, stating that he had placed an order the previous week for roses free of charge. Smith asked whether Anderson had received the order.

On May 15, 2003, Anderson responded to Calvin Smith, stating that the "free roses are part of the deal we made which includes Smith Rose making the May payments. Last I heard from Brad Earl, you thought this would happen."

On May 19, 2003, Anderson emailed Calvin Smith, stating that defendants were "now over $500,000 past due. Our proposed agreement would push out $135,000 of that amount, but we need payment in now (amounts that were really DUE LAST MARCH). You have not responded to Brad's letter to you. Brad will now be forced to now start the 'demand' process which will severely hinder Smith Rose credit status with any vendor . . . ."

Anderson also stated in his May 19 email that although Smith

5 - ORDER

had told Brad Earl that defendants had "pricing issues with old invoices," "we don't know what that is.  The last time I know of pricing/credit issues was 25 Feb and those were resolved.  We really haven't invoiced you for anything new after that so what is now the question?"

On May 23, 2003, Brad Earl emailed Calvin Smith, stating that as of that day, Smith Rose owed plaintiff $532,587.85, of which $506,610.58 was past due.  Earl stated that plaintiff would defer repayment of $157,800, as outlined in the promissory note sent to defendants dated May 10, 2003.  Earl stated that defendants needed to sign and return the promissory note, security agreement, and personal guarantees by May 30, 2003, for the deferral of repayment to begin.  Earl stated that without signed documents from defendants, plaintiff would expect payment of the past due amount immediately.  Otherwise, defendants were to pay plaintiff $348,810.58 by June 4, 2003.  Earl stated that if defendants did not meet these deadlines, then plaintiff would "begin legal action to collect the balance owed."

On July 9, 2003, an attorney for defendants faxed a letter to plaintiff concerning a settlement conference that was set for the next day.  The letter stated that defendants owed plaintiff $343,275, and that the parties "would need to acknowledge" that the original August 2002 agreement "is still in force."

By letter dated July 21, 2003, plaintiff's corporate counsel notified defendants that plaintiff was terminating the parties' August 2002 agreement.  The letter stated that termination was

6 - ORDER

under ¶ 18(a) of the agreement for defaulting on payments due.

In August 2003, plaintiff filed this action in state court. Defendants removed the action to this court in September 2003.

## CONCLUSIONS OF LAW

"A contract requires a clear and unequivocal acceptance of a certain and definite offer." Estey & Assocs., Inc. v. McCulloch Corp., 663 F. Supp. 167, 173 (D. Or. 1986) (applying Oregon law). A discussion will not create a contract "unless it is carried on to such an extent that the minds of the parties meet upon all the essential terms." Steel Prod. Co. of Oregon, Inc. v. FMD Corp., 282 Or. 513, 519, 579 P.2d 855, 858 (1978) (citations and quotation marks omitted). Because defendants assert the existence of a settlement agreement, they bear the burden of proof. See J. L. Price Brokerage Co. v. Baker Grocery Co., 94 Or. 538, 548, 186 P. 23, 25 (1919).

Defendants have failed to show that the parties reached a settlement agreement. The February 21, 2003 email is at most an offer to settle. It is not by itself sufficient to form a contract. Subsequent emails show that the parties did not agree on defendants' obligation to pay past-due invoices as a condition of giving Smith Rose credit for non-viable roses. See Anderson email of February 25, 2003 ("The agreement I made with Melvin only affects the May invoice, not the invoices already outstanding."); Earl Testimony, Nov. 14, 2003, Tr. at 35 ("[t]here was no doubt at any time that [defendants] had to pay the [$350,000] in order to get this [$150,000] timed payment concession"). The emails and

7 - ORDER

other evidence also indicate that the parties did not agree on
whether the Smiths as individuals would be required to sign
promissory notes and security agreements as a condition of the
proposed settlement agreement.

As an alternate ground for rejecting defendants'
counterclaim, the parties' failure to put the alleged settlement
agreement into a signed writing means that there was no binding
agreement. Paragraph 29 of the parties' August 2002 agreement
provides, "No waiver or amendment of any of the provisions of this
agreement will be valid unless set forth in a written instrument
signed by the parties to be bound." Under the Uniform Commercial
Code, as enacted by Oregon, "A signed agreement which excludes
modification or rescission except by a signed writing cannot be
otherwise modified or rescinded, but except as between merchants
such a requirement on a form supplied by the merchant must be
separately signed by the other party." Or. Rev. Stat. §
72.2090(2). The parties here are merchants. See Or. Rev. Stat. §
72.1040(1). There is no signed writing setting the terms of the
alleged settlement agreement.

Defendants contend that section 72.2090(2) does not apply
because Anderson admitted to the existence of the settlement
agreement during his testimony at a hearing in November 2003. See
Or. Rev. Stat. § 72.2010(3)(b). Under questioning by defendants'
attorney, Anderson agreed that his email of February 21, 2003 "was
the agreement that [Anderson] thought was reached" between the
parties. Regardless of Anderson's understanding, however, the

8 - ORDER

February 21, 2003 email was not sufficient to form a binding agreement.

Defendants also contend that oral modifications of written contracts may be enforceable despite an express clause in the original contract requiring that modifications be only by a signed writing. See, e.g., Bennett v. Farmers Ins. Co., 332 Or. 138, 147 n.7, 26 P.3d 785, 792 n.7 (2001). Here, however, I agree with plaintiff that the common-law rule allowing oral modifications is superseded by the applicable statute, Or. Rev. Stat. § 72.2090(2). See id.

### CONCLUSION

Defendants' counterclaim for breach of the alleged settlement agreement is dismissed.

DATED this ___7___ day of March, 2007.

OWEN M. PANNER
U.S. DISTRICT COURT JUDGE

9 - ORDER